# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| BRIAN J. NIXON, | : | Bankruptcy No. 07-16163DWS |
| | : | |
| Debtor. | : | |

---

# MEMORANDUM OPINION

**BY:  DIANE WEISS SIGMUND, United States Bankruptcy Judge**

Before the Court is the Objection of the debtor Brian J. Nixon ("Debtor") to the secured proof of claim in the amount of $322,471.85 filed by Michael T. Foster ("Foster"). For the reasons that follow, the Objection shall be sustained in part.

## BACKGROUND

The relevant facts are undisputed.  On or about December 27, 1994, the Debtor obtained a Business Loan from Quakertown National Bank (the "Bank") in the principal amount of $215,000.   In conjunction with that loan the Debtor signed a Promissory Note (Exhibit F-1), Business Loan Agreement (Exhibit F-2), and a Mortgage (Exhibit F-4, and collectively with F-1 and F-2, the "Loan Documents") on a parcel of real estate owned by the Debtor at 8184 Steinsburg Road, Coopersburg, Pennsylvania (the "Coopersburg Property").

On June 7, 2007, the Bank filed a Confession of Judgment in the Court of Common Pleas of Lehigh County, in the amount of $247,067.26 (the "Judgment"), allocated as follows:

| | |
|---|---|
| Principal: | $215,000.00 |
| Interest through 5/24/07 | 8,013.45 |
| Late Charges | 10,914.86 |
| Property Insurance | 1,619.68 |
| Attorney Fees | 11,519.27 |
| TOTAL: | $247,067.26 |

Exhibit F-5. Debtor concedes that the Judgment attached as a lien to Debtor's real property, including another parcel of land know as 1801-1821 Gerryville Pike, Bucks County, Pennsylvania (the "Gerryville Pike Property").[1]

The Bank subsequently executed a document titled "Assignment of Mortgage, Note, Assignment of Rents and Judgment" in favor of Foster (the "Assignment"). Exhibit F-3. The Assignment is undated. The Assignment expressly references the Mortgage, an Assignment of Rents, and the Judgment, and cites to them by docket number or filing number in the county Recorder of Deeds. Except for the reference in the title of the document, the Assignment does not expressly mention the Note. The Business Agreement is not referenced anywhere in the Assignment.

Debtor filed a voluntary petition under Chapter 13 on October 22, 2007. Foster immediately filed a motion for relief from stay ("Stay Relief Motion") with respect to the Coopersburg Property. At the hearing on November 20, 2007, the Debtor reported that he had a buyer for the Gerryville Pike Property which would pay Foster's claim

---

[1] Debtor owns several parcels of land, several of which are being sold to fund the Chapter 13 Plan.

in full.  I denied the Stay Relief Motion on the condition that Debtor remit the rental income

from the Coopersburg Property directly to Foster as adequate protection while Debtor

proceeded with that sale.  Doc. No. 20.  Debtor filed the motion to sell the Gerryville Pike

Property pursuant to §363 (the "Sale Motion") on December 21, 2007. Doc. No. 21.  On

January 3, 2008, I entered an Order approving Debtor's sale of the Gerryville Pike Property

for $365,000, which resulted in proceeds of $360,664.37 being distributed to the Chapter 13

Trustee.  Doc. No. 61 (Debtor's Report of Consummated Sale of Real Estate).

On October 10, 2008, Debtor filed his Second Amended Plan which is presently

before the Court.[2]  Doc. No. 94.  It, like the plan filed on July 8, 2007, provides for full

payment of Foster's allowed secured claim.  Foster objected because, inter alia, it did not

specify that payment would be made when the Gerryville Pike sale proceeds were received.

Doc. No. 97.[3]

Before the Court presently is Foster's Amended Proof of Claim setting forth a secured

claim in the amount of $322,471.85.  Exhibit N-5 (the "Foster Claim").  The liquidation of

the Foster Claim has been viewed by the Chapter 13 trustee as a necessary predicate to

determining plan feasibility. Notably the Foster Claim evidences a significant increase from

---

[2]  On December 19, 2008 I entered an Order setting for January 29, 2009 a final hearing on confirmation that has been continued enumerable times due to the pendency of the Objection as it appeared to me after colloquy with the Debtor and Chapter 13 trustee that the sole remaining objection to confirmation was feasibility and the Plan appeared to be feasible at the amount filed by Foster.  Doc. No. 111.

[3]  Notwithstanding that complaint, Foster failed to press for payment of the liquidated amount of the Foster Claim at the time of the sale of the Gerryville Pike Property and, according to Debtor's counsel, did not accept an offer to transmit the proceeds to that extent.  On December 18, 2008 I raised this issue sua sponte and learned of the Debtor's proffer of partial payment.  I immediately entered an Order directing that such payment be made to ensure that there would be no further claim for accruing interest.

the Judgment amount which is attributed to the post-judgment accumulation of interest and

late charges ($49,097.75), and attorneys fees and costs ($26,306.84). Foster's position is that

these expenses and interest at the default rate continue to accrue. The Objection asserts that

Foster is limited to the Pennsylvania statutory rate of interest (6%) and that the bulk of

post-judgment attorneys' fees and costs are unreasonable.

The interest rate under the Note is a variable one that is tied to the Bank's Base

Lending Rate (the "Index") and is defined as one percentage point above the Index. Exhibit

F-1 at 1. The Note also contains a provision for "interest after default" that give the lender

the option of raising the rate to five percentage points above the Index upon default. Id. The

only evidence of the Index was Foster's testimony that the Index was 8.25 percent at the time

of Judgment. Tr. at 52.[4]

Foster has employed three attorneys to represent him in this matter. His first entry of

appearance in this case was through Marc Kranson, Esquire ("Kranson"), who provided 12.3

hours of services at an hourly rate of $185 plus costs of $150 for a total of $2,425.50.

Exhibit F-8. Kranson prepared for and attended all hearings on behalf of Foster and prepared

and filed all of Foster's pleadings until October 2008, when he withdrew as counsel and was

replaced by Michael Kaliner, Esquire. ("Kaliner"). Kaliner handled the defense of the

---

[4] Foster contends the rate is fixed at the date of judgment. As stated below, I respectfully disagree. Debtor appears to have recognized this deficiency in the record but argues that it is Foster's burden upon Debtor's objection to produce evidence of the interest rate. While that may be so, it does not give me a basis to liquidate the claim for the purpose of confirmation. I have made this clear to the parties and hopefully at the January confirmation hearing, they will be prepared to deal with this issue.

Objection, serving as trial counsel and author of the memorandum of law.  Debtor does not

object to Kranson's or Kaliner's fees and costs.[5]

Foster also employed Ronald L. Clever, Esquire ("Clever"), who has billed 106 hours

at an hourly rate of $275, resulting in $29,190 in fees and costs for services rendered

with respect to this case from September 2007 to September 2008.  Exhibit F-9.  Clever is

a general practitioner who has represented Foster in various matters over the last fifteen

years.  Tr. at 83.  Clever never filed an Entry of Appearance on behalf of Foster in

the bankruptcy case, although he has addressed the Court at various hearings, primarily

to register his client's extreme displeasure at the deferral of payment occasioned by Debtor's

resort to bankruptcy.  He has not signed any of the motions or pleadings submitted on behalf

of Foster.  Clever has repeatedly advised the court that his practice is not focused in

bankruptcy, that he does not have the appropriate bankruptcy forms and that he is not an

authorized user of the Court's now mandatory electronic filing system.  See, e.g., Tr. at 85.

Notably while there have been many scheduled hearings in this Court in the Nixon

bankruptcy case, not much has happened between the settlement of the Stay Motion and

the Objection hearing.  The Debtor filed a Chapter 13 sale plan and the case was monitored

with numerous status hearings to ensure that Debtor was working toward that end and

fulfilling all other Code requirements applicable to a Chapter 13 debtor.  Nonetheless, Clever

---

[5]   Kranson withdrew stating that his client wished to have local counsel.  Doc. No. 74.
Kaliner is a member of the bar of this Court.  Kaliner's fees are not included in the Amended Proof
of Claim, which is not surprising given his very recent opinion.  Foster has paid a $1500 retainer
to Kaliner.  Tr. at 60.

appeared at most (if not all) of the hearings to object to whatever was contemplated or happening.

Foster's need for two attorneys on this case was never clearly explained. Foster simply stated that Clever was his "main" attorney and Kranson's job was to "deal with the filings." Tr. at 58. However, Kranson also represented Foster at hearings, prepared, filed and prosecuted the Stay Relief Motion, and prepared and filed the Objection to Confirmation. Exhibit F-8. While Clever's invoice for services includes entries for research, preparation, and reviewing of pleadings, there is nothing to indicate that Clever created written work product that was used in pursuit of the Foster Claim. Exhibit F-9. Nor is there any corresponding notation in Kranson's time entries to indicate incorporation of Clever's work or revisions made after discussion with Clever. Exhibit F-8.

There are numerous areas of overlap in the bills of Clever and Kranson. For example, both billed 1.5 hours for preparation for the Stay Relief Motion in November 2007 and both billed for attending the hearing on that motion. Kranson billed 2 hours, expressly not billing for travel. Clever billed 6 hours, including travel. Exhibits F-8 and F-9; Tr. at 81. Clever also billed for attending other hearings which Kranson attended and reviewing pleadings prepared by Kranson which Clever billed for reviewing. While I will discuss Clever's role in more detail below, it appears that Clever viewed himself as acting not unlike an in-house counsel supervising a hired attorney. Tr. at 84.

A hearing on the Objection was held on September 11, 2008. As noted, Kaliner was the attorney and Clever was a witness to his fees. The parties agreed to a rather protracted

briefing schedule. To accommodate the briefing schedule requested by Foster, his counsel agreed that to the extent that post-judgment interest is allowable, seven weeks of interest will be credited to Debtor.  Tr. at 115-16.  In addition, as noted above, after the confirmation hearing held on December 18, 2008, I ordered the Trustee to pay Foster the uncontested Judgment amount to ensure no further claim for interest accrual could be made.


# DISCUSSION

Bankruptcy Rule of Procedure 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure constitutes <u>prima facie</u> evidence of the validity and amount of the claim.  <u>E.g.</u>,  <u>Amatex Corporation v. Aetna Casualty & Surety Co., et al.</u>, 107 B.R. 856, 870 (E.D. Pa. 1989); <u>In re Sacko</u>, 394 B.R. 90, 98 (Bankr. E.D. Pa. 2008); <u>In re Kincaid</u>, 388 B.R. 610, 613 (Bankr. E.D. Pa.  2008).  "In short, the allegations of the proof of claim are taken as true" and are "strong enough to carry over a mere formal objection without more."  <u>Sacko</u>, 394 B.R. at 97-98 (<i>quoting</i>  <u>In re Holm</u>, 931 F.2d 620, 623 (9th Cir.1991)).  The objecting party carries the burden of going forward with evidence in support of its objection which must be of probative force equal to that of the allegations of the creditor's proof of claim.  <u>Id</u>.  "[T]he objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." <u>In re Allegheny International, Inc.</u>, 954 F.2d 167, 173-74 (3d Cir. 1992).  If the objecting party succeeds in overcoming the <u>prima facie</u> effect of the proof of claim, the ultimate burden of persuasion then rests on the Claimant.  <u>Id.</u> at 174.

The parties agree that the Foster Claim is oversecured and therefore Foster is entitled

to continuing interest and costs pursuant to 11 U.S.C. § 506(b), which states:

> To the extent that an allowed secured claim is secured by property the value
> of which, after recovery under subsection (c) of this section, is greater than the
> amount of such claim, there shall be allowed to the holder of such claim,
> interest on such claim, and any reasonable fees, costs, or charges <u>provided for</u>
> <u>under the agreement or state statute under which such claim arose</u>.

<u>Id.</u> (emphasis added).  Foster relies upon the Loan Documents, primarily the Note, which

expressly provide for post-judgment interest and attorneys' fees.

Debtor initially argues that the Assignment expressly references the Mortgage, an

Assignment of Rents, and the Judgment, but not the Note or Business Loan Agreement,

and therefore those two documents were not assigned to Foster and grant him no rights.

Brief of Debtor is Support of Objection ("Debtor's Mem.") at 2-3.  Debtor cites no authority

to support his argument, and it appears that Pennsylvania law does not require the specificity

that Debtor argues for: "The subject matter of the assignment should be described with such

particularity as to identify it, but no greater particularity is required than is actually necessary

to do this, with the aid of the attendant and surrounding circumstances."  <u>Commonwealth v.</u>

<u>Barnes</u>, 162 A. 670, 676 (Pa. Super. 1932).

While the Note and Business Loan Agreement are not specifically identified in

the body of the Assignment, the title of the Assignment does reference a "Note."

Moreover, Debtor concedes that the Mortgage agreement is specifically identified.

The Mortgage contains an integration clause stating that:  "This Mortgage together with

any Related Documents, constitutes the entire understanding of the parties as to the

matters set forth in this Mortgage."  Exhibit F-4 at 5 (Miscellaneous Provisions).  "Related

Documents" is broadly defined to include "all promissory notes, credit agreements, loan

agreements . . . and documents, whether now or hereafter existing, executed in connection

with the Indebtedness." Id. at 6.  "Indebtedness" in turn is defined to include amounts

"payable under the Note or Related Documents." Id.  "Note" is defined as "the promissary

note dated December 27, 2004." Id.  Thus, I find that the subject matter of the Assignment

is sufficiently identified as encompassing all the rights related to the Indebtedness,

including rights under the Note and Business Loan Agreement, and Foster shall be allowed

post-judgment interest and costs to the extent provided in those documents.

### A.  Interest Rate

The Note clearly provides for post-judgment interest as evidenced by the following

provision:

> **INTEREST AFTER DEFAULT.**  Upon default, including failure to pay
> upon final maturity, Lender, at its option, may, if permitted under applicable
> law,[6] increase the variable interest rate on this Note to 5.000 percentage
> points over the Index.  The interest rate will not exceed the maximum rate
> permitted by applicable law.  If judgment is entered in connection with this
> Note, interest will continue to accrue on this Note after judgment at the rate
> applicable to this Note at the time judgment is entered.

Exhibit F-1 at 1 (emphasis added).   The highlighted language clearly indicates that the

interest rate "applicable to this Note" shall continue beyond entry of judgment.  I therefore

reject Debtor's contention that Foster is limited to the legal rate of interest since the merger

doctrine is not applicable where the loan documents provide for the contractual rates

post-judgment.  In re Stendardo, 991 F.2d 1089, 1094 (3d Cir. 1993).

Debtor also objects to the Foster Claim insofar as it seeks interest at the "Default

---

[6] Debtor makes no argument that Pennsylvania law precludes imposition of the Default Rate.

Rate" allowed under the Note. While there is no question that Debtor was in default or the

Judgment could not have been entered by confession, Debtor relies on the fact that, at the

time Judgment was entered, Bank was only charging him the regular contract rate of interest

which is Index plus one percent, i.e., 9.25 percent, notwithstanding that he was in default.

Tr. at 34-35. Debtor asserts, without authority, that because the Bank chose not to apply

the default rate, Foster is held to the rate actually charged by the Bank at the time of

Judgment. I respectfully disagree.

Debtor's argument assumes that "applicable" interest rate means the rate actually

being imposed at the time of Judgment. However, the plain meaning of the word

"applicable" is "capable of or suitable for being applied." Merriam Webster's Collegiate

Dictionary at 57 (10th ed. 1995) (emphasis added). Therefore, the fact that the Bank may

have chosen not to apply the Default Rate is not dispositive. That provision makes clear that

the Default Rate was capable of being applied at the Lender's option upon Debtor's default.

Moreover, the Note expressly states that "Lender may delay or forgo enforcing any of its

rights or remedies under this Note without losing them." Exhibit F-1 (General Provisions).

As assignee, Foster stands in the shoes of the assignor (Bank) and assumes the rights of the

assignor. Crawford Cent. School Dist. v. Pennsylvania, 888 A.2d 616,619-20 (Pa. 2005).

Therefore, he may choose to apply the Default Rate as he did on September 25, 2007.

Exhibit F-6.[7]

---

[7] I disagree with Foster's position taken in that letter that the rate should be 18.25%.
Foster has added an additional 5% to the rate based on his view that the late charge is also

While I agree with Foster that he is entitled to impose the Default Rate, I also agree with Debtor that he may not do so for the period that the Bank was not doing so.  Thus, I reject Foster's contention that he may charge the Default Rate retroactively to the date of Judgment when he had no rights under the Note at that time and there is no evidence that the Bank had ever imposed the higher charge. The rights of Foster, as assignee, rise no higher than those of the Bank.  He had the right as of the date he acquired his interest in the loan documents to impose the higher rate, and Foster's letter to Nixon written shortly after the undated assignment provides evidence in the record that he did so.  Id.  Thus, the Default Rate is applicable to the Amended Claim but it begins to run as of September 25, 2007, not June 7, 2007 when the Bank took judgment.

However, merely determining that the Default Rate is applicable post-assignment does not answer the question of how much interest has accrued and is continuing to accrue. Foster provided a Payoff Analysis that simply applies a rate of 13.5 percent from the Judgment date onward.  Exhibit F-7.  Implicit in his analysis is the assumption that the Judgment locked in a specific, static rate.  However, the interest rate under the Note, whether default rate or otherwise, is tied to Bank's Index Rate.  The Note clearly states that the Index Rate may change on a daily basis.  Exhibit F-1 at 1 ("Variable Interest Rate" provision).  Indeed, a variable or adjustable rate loan is one which by definition is "adjusted periodically according to the cost of funds to the lender." Merriam Webster's Collegiate Dictionary at 15 (10th ed. 1995) (defining "adjustable rate mortgage").

It seems almost certain that the Bank's Index Rate has changed several times since

_____

applicable.  See infra n. 9.

judgment was taken in June 2007.[8]  However, no evidence was presented as to the Index

Rate save that it was 8.25 percent as of June 2007.  Nevertheless, given the record and

current events of which I may take judicial notice, I find that Debtor has met his initial

burden of casting doubt upon Foster's claim of a static interest rate of 13.25 percent.

The ultimate burden of persuasion is upon Foster, as claimant, to quantify the rate, and he

has failed to do so.

The Debtor argues that in light of this failure of proof, I should apply the statutory

judgment interest rate.  He provides no authority for me to do so.  The Note clearly provides

a methodology to quantify the proper rate by reference to the Index Rate.  The Index Rate

history is something which is readily discoverable.  With this information, Debtor and Foster

should be able to stipulate what the interest rate was over the applicable time period.  Thus,

I will only hold here that Foster is entitled to interest from the date of judgment to the date

of assignment at the Index Rate plus one percent and from the date of assignment at the

Default Rate, i.e., Index Rate plus five percent.  Moreover, as reflected on the record, interest

stopped accruing on September 11, 2008, the date of the hearing on the Objection, during the

briefing schedule agreed to by the parties.  While the briefs are now filed, interest shall not

resume on the judgment amount as Debtor had tendered an offer to pay which was not

---

[8] Without delving too far into a discussion of economic policy in the United States, the costs
of funds to lenders is generally determined by the "federal funds rate," i.e., the interest rate at which
private depository institutions (mostly banks) lend balances (federal funds) at the Federal Reserve to
other depository institutions. See, e.g., http://www.newyorkfed.org/aboutthefed/fedpoint/fed15.html
(Explanation of the Federal Reserve System and federal funds rate).  The cost that lenders pay
to borrow influences the cost they charge to lend.  In the last year, the Federal Reserve has
made several significant cuts in the federal funds rate to stimulate the economy, dropping from
4.75 percent in September 2007 to the current range, below a single percentage point.
See http://www.federalreserve.gov/fomc/fundsrate.htm.

accepted; it will now be paid by my Order.  Hopefully this Memorandum Opinion shall provide sufficient guidance to allow the parties to calculate the appropriate interest component of the Claim.  If they cannot, the burden remains with Foster to present evidence so I may calculate it which I will do based on the record made at the final confirmation hearing in January.

### B.  Late Charges

Foster asserts that his entitlement to post-judgment late charges stems from the following provision in the Note:

> **LATE CHARGE**.  If a regularly scheduled interest payment is 16 days or more late, Borrower will be charged **5.00% of the regularly scheduled payment or $20.00, whichever is greater.**  If Lender demands payment of this loan, and Borrower does not pay the loan in full **within 16 days after Lender's demand, Borrower will also be charged either 5.00% of the sum of the unpaid principal plus accrued unpaid interest or $20.00, whichever is greater.**

Exhibit F-1 (emphasis in original).[9]  Foster relies upon the second condition of this provision, i.e., a demand of payment.  See Foster Mem. ¶ A.3. at 4.  To the extent that failure to pay a judgment can be construed as a demand for payment to which late charges attach, there is no language in the Note that indicates that this provision was intended to survive judgment (unlike the interest rate provision).  Therefore, under the merger doctrine, this provision cannot provide the basis for a post-judgment Late Charge.  Stendardo, 991 F.2d at 1094.  As Foster cites no other provision in the other Loan Documents to support the continued

---

[9]  This is the provision that served as the basis of Foster's demand that the current interest rate is 18.25%.  Exhibit F-6.  He takes the Index Rate on June 7, 2007 of 8.25%, adds the five points for the default rate and then another five point for Late Charges, a methodology challenged by Debtor.  Debtor's Mem. at 5-6.

imposition of late charges post-judgment, the Objection will be sustained and late charges will be disallowed.

### C.  Attorneys' Fees and Expenses

(i)

Where the parties' contract so provides, § 506(b) allows reasonable attorneys' fees and costs with respect to oversecured claims, and it is stipulated that Foster is oversecured. However, as with the interest and late charges, the availability of attorneys' fees  will depend not only on whether they are contractually permitted but whether they are contractually permitted post-judgment.  Foster refers to the Mortgage for support to recover his post-judgment attorneys' fees and costs.  Tr. at 50.  That document expressly includes "subject to any limits under applicable law," . . . attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction).  Exhibit F-4.  The Business Loan Agreement contains the identical language.  Exhibit F-2.  Unlike the late charges which were provided for under the Note and which merged into the Judgment when confessed, the Mortgage and Business Loan Agreement have not merged and remain an independent source of rights and remedies to its holder and a basis for post-judgment attorneys' fees and expenses. Stendardo, 991 F.2d at 1095-96 (distinguishing the foreclosed mortgage before it with Clark Screw Machine Products Co. v. Clark Grind & Polish (In re Clark Grind & Polish), 137 B.R. 172, 173 (Bankr. W.D. Pa. 1992), which involved a judgment based solely on a note which did not extinguish independent provisions found in the mortgage and asset purchase agreement).  Since the Mortgage and Business Loan Agreement in this case have not merged into the Judgment and since they expressly provide

for attorneys' fees and costs, they may be a component of the Foster Claim, subject to their

reasonableness.  Debtor does not contend otherwise but rather challenges the reasonableness

of the total post-judgment attorneys' fees of $33,115.60, specifically the $29,190 charged by

attorney Clever.  Exhibit F-7; Debtor's Mem. at 7.   He contends that Clever's work was

unnecessary and of tentative value at best to the enforcement of Foster's rights as a creditor.

He notes the gross disparity between Clever's fees and those of the other two attorneys

together for the same period of time.

(ii)

Initially, Foster claims we need not even address the Debtor's objection with respect

to the reasonableness of attorneys' fees and costs.  He reasons that as the Chapter 13 plan

proposed by Debtor contemplates a 100% payout to unsecured creditors, whatever fees are

found unreasonable under § 506 will remain as unsecured claims and be paid anyway.  Thus,

he concludes, the challenge to their reasonableness is "academic."  I respectfully disagree.

In support of his position, he cites to Welzel v. Advocate Realty Investments (In re Welzel),

LLC, 275 F.3d 1308 (11th Cir. 2001), for the proposition that § 506(b) is not a disallowance

provision.  Memorandum of Law in Support of the Amended Proof of Claim of Michael

Foster ("Foster's Mem.") at 5.  However, as the Welzel court noted, § 506 should be read in

tandem with § 502: "Section 502 deals with the threshold question of whether a claim should

be allowed or disallowed.  Once the bankruptcy court determines that a claim is allowable,

§ 506 deals with the entirely different, more narrow question of whether certain types of

claims should be considered secured or unsecured." Id. at 1317-18.  In short, I construe the

Objection as seeking disallowance of certain components of the Foster Claim under § 502,

not as an objection to their secured status under § 506.

Section 502(b)(1) disallows claims that are unenforceable against debtors under applicable law. While Pennsylvania law allows contractual shifting of attorneys fees, it also "dovetails neatly with Bankruptcy Code Section 506(b) . . . in that both state and federal law require that the fees sought must in all events be <u>reasonable</u>." <u>In re West Chestnut Realty of Haverford, Inc.</u>, 186 B.R. 612, 618 (Bankr. E.D. Pa. 1995) (emphasis in original). <u>See</u> <u>also</u> <u>McMullen v. Kutz</u>, 925 A.2d 832, 835 (Pa. Super. 2007) ("when a contract provides for the award of counsel fees, but does not specify that they must be reasonable, the trial court must nonetheless examine the fees for reasonableness"). Thus, to the extent that Foster's claim for attorneys' fees are unreasonable, they are not enforceable under Pennsylvania law and therefore do not constitute an allowed unsecured claim.

(iii)

Debtor asserts, and I agree, that the proper methodology to review Clever's fees is the lodestar approach, <u>i.e.</u>, multiplying the total number of hours reasonably expended by the reasonable hourly rate. <u>In re Gordon-Brown</u>, 340 B.R. 751, 755 (Bankr. E.D. Pa. 2006); <u>Signora v. Liberty Travel, Inc.</u>, 886 A.2d 284 (Pa. Super. 2005). In determining the reasonableness of attorneys' fees, Pennsylvania courts have looked at factors such as: the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was 'created' by the attorney; the professional skill and standing of the attorney in his profession;

and the results he was able to obtain.  E.g., Mulholland v. Kerns, 822 F.Supp. 1161, (E.D. Pa. 1993) (citing In re LaRocca's Trust Estate, 246 A.2d 337 (Pa. 1968)).  "Hours are not reasonably expended if they are excessive, redundant or unnecessary."  Simmons v. City of Philadelphia, 2001 WL 15958, at *1 (E.D. Pa. 2001).

Before addressing the Debtor's challenges to Clever's hourly rate and time charged, I need to establish the context for my review of the evidence presented in support of the fee. As the bankruptcy judge administering this Chapter 13 case, I have had numerous occasions to observe Clever's participation as he routinely appeared at the continued confirmation and dismissal hearings.  I also have a clear sense developed over fifteen years of presiding over Chapter 13 matters, which constitute the bulk of this Court's docket, of what is and what is not necessary to move a case toward its ultimate goal:  confirmation and payment of creditors.  I begin by noting that Foster is a secured creditor and acknowledged by the Debtor to hold allowable judgment liens on Debtor's real properties valued comfortably in excess of his claim.  Indeed at the beginning of the case, Debtor sold the Gerryville Pike Property and received proceeds that exceeded Foster's lien on that asset.  In short, Foster has never been in jeopardy of non-payment.  The only question has been when that would happen.

Clever's legal strategy has been to attend the scheduled bankruptcy hearings to object and/or urge dismissal of the bankruptcy case.  His lack of knowledge about the bankruptcy process precluded focused and meaningful objections lodged at the appropriate time. Clever's serial and costly appearances urging dismissal as the confirmation process progressed illustrate this point.  Ironically his complaints about the protracted nature of the case only protracted the hearings more.  Debtor had a well defined concept for his

-17-

reorganization from the outset; it involved selling properties. That process takes time. Given Debtor's assets and ability to make adequate protection payments, his Chapter 13 case was not in jeopardy of a premature dismissal. A lawyer familiar with Congress' intended balance between a debtor's right to reorganize and a creditor's right to be paid would have known that. Moreover, had Clever worked with the Debtor toward a successful conclusion to the case, a far less amount of time would have been spent by everyone, including the Court. Clever's approach and the attendant cost in hours he billed was in and of itself unreasonable.

Nor can I conclude that it was ever Clever's intention to charge Foster for these hours that he allegedly spent. He admitted he prepared the invoice that is the basis of the attorneys' fee component of the Foster Claim on September 2, 2008, presumably in connection with this litigation and in any event not contemporaneously with the provision of any services. He has never transmitted the invoice to Foster for payment. Tr. at 70. He had every incentive to use a heavy hand based on his view that Debtor would be responsible for payment. His failure to acknowledge contemporaneous timekeeping and to seek payment from his client undermines the credibility of his billing.

(iv)

Debtor asserts that Clever's hourly rate of $275 is unreasonable. A reasonable rate is the prevailing market rate in the relevant community. Loughner v. Univ. of Pittsburgh, 260 F.3d 173, 180 (3d Cir. 2001). Neither Debtor nor Foster presented any evidence of the market for the services provided by Clever. Indeed I do not even know whether the rate he

-18-

seeks is the normal rate he charges his other clients for like services.  Nor do I know whether

he intended to charge Foster at that rate since he did not actually bill him.  See supra.  Debtor

cites to Gordon-Brown, supra, where Judge Frank deemed $200 per hour as a reasonable

hourly rate for a mortgage holder's attorney in a consumer mortgage collection matter.

340 B.R. at 759.  Judge Frank did so, relying on his own experience and the paucity of the

record.  Id.  Since this is the rate suggested by Debtor and Clever has provided no  evidence

to controvert it, I will follow Judge Frank and fill the void of the record by applying a

$200/hour rate.  This decision is supported by the hourly rate charged by Kranson, the

seasoned bankruptcy attorney, of $185.  Given Clever's lack of bankruptcy expertise,

evidenced by Foster's need to use Kranson and Kaliner, and his consequent lack of

contribution to the contested matter, a rate substantially higher would not be warranted.

Finally and relevant to a reasonableness analysis, there were no special or usual legal issues

involved in this routine Chapter 13 case.

(v)

The thrust of Debtor's objection is to the reasonableness of Clever's time, which

Debtor characterizes as unnecessary duplication and/or supervision of Kranson's work.

I agree with Debtor that in many respects, as discussed more fully below, Clever's work

appears to duplicate or simply review Kranson's work product.  Moreover, I found that his

appearance at hearings did not assist Kranson in any way that I could observe.  While Foster,

a lawyer himself, may have wanted the comfort of having his long-time attorney review and

supervise everything done by his "bankruptcy counsel," I question whether he would pay

almost $30,000 for what was, at best, a belt and suspender approach to legal staffing.  In any

-19-

event, this approach was not objectively reasonable.

Debtor also takes issue with Clever's methodology of putting a generic entry at the end of each month to cover all phone calls that month rather than identifying the date and time of each call. These entries, which vary from 0.5 to 1.5 hours are characterized by Clever as "catch-all" entries to reflect conversations he has when he is outside the office. Tr. at 87. However, there was no explanation as to how he comes to these ballpark figures, and I find this practice somewhat unreliable because Clever concedes that he incorporates telephone conversations into other time entries. Tr. at 75 (1.5 hour charge for "reviewing documents" includes making copy for and discussing with client). Therefore, as it appears that telephone calls have been "built into" other time entries for the month and as the entries were not contemporaneously recorded, I will disallow the generic catch-all telephone call time entry on each month's summary.

I also note that all of Clever's time appears to be in minimum of 0.5 entries, suggesting a rounding that undermines the reliability of the entry as it relates to actual time spent. As noted above, Clever prepared his bill after the fact and presumably from his files and/or memory. His rounding is not surprising if he was preparing his statement from memory versus contemporaneous time records. My judgment as to allowable time each month is informed by this practice.

I have gone through Clever's bill throughly and the following is a detailed commentary on the invoice. Reference is to Exhibit F-9 unless otherwise stated. My general comments and specific references to billing entries are provided as support for the significant, but warranted reduction I have made to the attorneys' fees charged by Clever to

this file.

September 2007 (6.5 hours). The time charged this month before the bankruptcy case was filed and before other lawyers were retained appears to involve preliminary steps toward collecting on the Judgment. Other than the generic phone call entries, Debtor has not challenged these expenses so they will be allowed. Total allowed time - 6.0 hours.

October 2007 (7.5 hours). Clever spent time reviewing the bankruptcy filings and postponing a sheriff's sale (1.5 hours), preparing for and meeting with the client and bankruptcy counsel (3.0 hours). These charges made prior to the engagement of Kranson, while a little imprecise, are generally reasonable. The same cannot be said for his review of the motion for relief from stay ("Stay Motion") prepared by Kranson and research of issues regarding the Stay Motion, and "few changes" to the Motion (2.0 hours). The invoice entry does not identify what issues were researched, nor did Clever recall what those issues were when questioned. Tr. at 74-75. The Stay Motion was a three-page document containing no citation to legal authority. Moreover, Kranson billed only 1.5 hours to prepare, file, and serve the Motion. I agree with Debtor that Clever's two-hour charge is time that was not reasonably expended and will allow 0.5 for his review and comment. Total allowed time - 5.0 hours.

November 2007 (14.5 hours). Clever charged 1.5 hours on November 11, 2007, for "review of several new filings in this matter." When questioned, Clever could not identify the filings that he reviewed. Tr. at 75. Clever charged another 1.5 hours on November 14 to review Debtor's response to the Stay Motion (two pages) and the Chapter 13 Plan (two pages) and discuss them with Foster. Kranson also charged for reviewing these two

documents, but only 0.1 hour per document.  Again, even considering that this includes time

that Clever spent discussing these documents with Foster, Tr. at 75-76, I agree that 1.5 hours

is excessive, particularly given Clever's subsequent time spent in connection with the Stay

Motion, discussed next. Debtor has also objected to as excessive Clever's charges related to

preparation and attendance at the November 20, 2007 hearing on the Stay Motion.  I begin

by noting that Kranson charged 1.5 hours for preparation on November 19 and 2.0 hours for

representation at the hearing, expressly not charging for 2 hours of travel.  Exhibit F-8.

Debtor concedes Kranson's fees are reasonable.  In contrast, Clever charged a total of 10

hours related to the Stay Relief Motion.  The actual hearing lasted approximately 1 hour and

40 minutes and I do not recall any complex legal issues raised that would justify this amount

of preparation on top of the 1.5 hours Kranson charged.  More importantly, while Clever was

present in the courtroom, it was Kranson who prosecuted the motion.  There simply was no

need for Clever to attend the hearing.  With respect to his research, as noted Clever cannot

recall the issues he researched, Tr. at 74-75, nor am I persuaded that this research was

necessary for prosecution of the Stay Motion.  Total allowed time - 0 hours.

December 2007 (6.5 hours).  Clever charged 4.5 hours to review Debtor's motion to

sell the Gerryville Pike Property and to research the feasibility of that sale.  This work was

apparently to satisfy his concern that the sale would not go through. Tr. at 77.  The motion

was a short pleading that would take minutes to review.  It was Debtor's burden to establish

the feasibility of that sale and Foster's right to examine him at the hearing to ensure that the

sale was not speculative.  While some time was properly allocated in assisting with the

preparation for that hearing, which was handled by Kranson, the time, including the 12/19

entry for one hour to discuss status of case, was excessive.  Total allowable time- 1.0 hours.

January 2008 (1.5 hours).  This time was charged to prepare an order and postpone an execution sale, presumably of the Coopersburg Property that was the subject of the denied Stay Relief Motion.  I find 0.5 to be a more reasonable amount of time for such a mundane task.  Total allowed time - 0.5 hours.

February 2008 (11.5 hours).   Clever billed five hours for preparation for and attendance at the § 341 meeting of creditors.  However, he was advised by Debtor's counsel and the Chapter 13 trustee that it would not be conducted as Debtor had not completed his tax returns. The Trustee said the meeting could not be continued over Foster's objection which he refused to withdraw upon learning that the Trustee would file a motion to dismiss as a result. Tr. at 91 ("I was not in a position to pass up an opportunity to have a motion to dismiss pending. ...").  These meetings are continued routinely to allow documentation to be produced and this one was rescheduled as well, but only after Clever forced court intervention.   Thus, the time to prepare and attend a meeting that could not happen and should have been consensually continued will not be allowed.  Two hours were charged for a "status meeting" with the client, and there is also a two-hour charge to research and prepare for a motion to dismiss brought by the Trustee.  The motion was a form pleading routinely used by the Trustee to address one or more case deficiencies.  Doc. No. 29.  It is has long been the practice of the Trustee to continue these motions repeatedly as the Debtor complies with  the  missing  requirements  and  essentially  using  the  Court's  docket  to  monitor

compliance. There is nothing in that motion that should require legal research by a creditor.[10]

More importantly, these billed services illustrate my preliminary point, i.e., the time does not further collecting the outstanding debt. There was simply no reason for Clever to spend this time on the Trustee's dismissal motion. Total allowed time - 1.0 hours.

March 2008 (12.0 hours). Eleven hours are related to the Dismissal Motion. As I noted above, it is common for the Trustee's dismissal motions to be continued numerous times and the March hearing was continued from March 6 to March 20 and then to May. Notably, Clever is billing for his time in coming down to the courthouse on these days as well as more "research." Had he made a phone call to the Trustee, the trip would not have been necessary. He also could have requested to participate by telephone if he was intent on monitoring the non-event. Furthermore, as discussed above, the dismissal motion was partly attributable to Foster's failure to consent to Debtor having additional time to file the missing tax returns. I therefore have no problem striking these hours in their entirety. Total allowed time - 1.0 hour.

April 2008 (5.0 hours). Clever charges all this time for preparation for and attendance at the rescheduled § 341 creditor's meeting. How much of that time is preparation and how much is travel is not stated. In any event, given his active involvement in the case, I can't imagine the need for much "preparation." For the reasons stated above, I will allow 3 hours

---

[10] Clever explained that "research" is a broad term that includes, in part, discussions with the Trustee's staff attorney. Tr. at 78. However, I would expect such conversations to be included in the catch-all telephone time entry of 1.0 hours.

for his attendance and travel. Total allowed time - 3.0 hours.

May 2008 (16.0 hours). Clever charges this time for reviewing documents, doing research on plan feasibility, attending client meetings, and preparing for the confirmation hearing. His entry of 6.0 hours for attending a hearing on the once again adjourned motion to dismiss and confirmation hearing[11] evidences the absence of billing judgment that persisted. There simply was no reason to spend this time, if indeed it was spent. He includes 3.0 hours for research into the sale being proposed yet none of that information was ever part of an objection or evidence at a hearing (see below). Moreover, the sale took place as proposed shortly thereafter. Total allowed time - 2.0 hours.

June 2008 (8.0 hours). Clever spent this time reviewing, discussing with the client and attending the hearing on the sale motion, to which he again affixes a time value of 6.0 hours. Approval of the sale was so clearly in the interests of the Debtor, Foster and all other creditors that it is incomprehensible that this amount of time was required. He did not controvert the sale motion with any evidence, but merely continued to register wholesale and conclusory objections. He will be allowed 1.0 hours for attendance at the hearing. Total allowed time - 1.0 hours.

July 2008 (7.0 hours). Clever attributes 6 hours to preparation for and attendance at another continued confirmation hearing. There was no reason for him to be there. Local

---

[11] When I questioned him about this in Court, noting that the hearings took a matter of minutes, he replied that he included time spent waiting in the courtroom and sitting in the car discussing the matter with his client. Tr. at 81.

bankruptcy counsel had been engaged.  Nothing was going to happen and he contributed nothing to his client or the case. He also spent time providing back-up information for an amended proof of claim. Total allowed time - 1.0 hours.

August 2008.(6.0 hours).  Clever billed 2.0 hours transitioning to a new bankruptcy attorney and researching (3.0) hours for the upcoming hearing on the claim objection.  The first activity cannot be charged against the Debtor; the second is vague.  The claim objection was filed by Kranson and scheduled for October.  I have no idea what he was researching in August.  His additional 1.0 hour for document review is equally perplexing. Total allowed time - 0 hours.

September 2008 (4.0 hours).  Clever billed for meeting with client and preparing for the upcoming claim objection hearing scheduled for September, 11 2008, a matter Kaliner was handling.  I again have no idea what he was doing to collect Foster's claim during this time and will not allow it. Total allowed time - 0 hours.

In summary, Clever's services for the relevant periods discussed were in large part either duplicative, unnecessary, vaguely described so as to be incapable of analysis or detrimental to the task he purported to pursue, prompt payment of his client's judgment.[12] That portion of the claim attributable to Clever's legal fee of $29,150 will be allowed at $4,300, representing 21.5 hours at $200/hour.  The costs of $40 will also be allowed. The Foster Claim will be reduced accordingly.

---

[12] Where he had the ability to be constructive, such as seeking and when offered, accepting payment of the undisputed portion of his client's claim, he demurred.

## CONCLUSION

Foster seeks an allowed secured claim in the amount of $322,471.85 as reflected in the amended proof of claim dated July 3, 2008. The Objection contests the interest and late charges of $49,097.75 and attorneys' fees of $26,306.84. The interest and late charges are not separately stated. Exhibit N-5. Moreover, Foster asserts that the claim has grown to $337,171.51 as of September 4, 2008 by reason of accruing interest and attorneys' fees which are stated to be $33,115.50 as of that date.[13] Exhibit F-7. This Memorandum Opinion cannot liquidate this claim for the reasons stated above. However, the legal issues that have been decided should enable reasonable parties to determine the amount Foster must be paid to satisfy his secured claim. There is no dispute about the judgment amount and it should be paid pursuant to my December 18 Order, if it already has not been. Foster is entitled to interest at the contract rate of Index plus 1% from June 7, 2007 (the date of the Judgment) to September 25, 2007( the date he gave notice of the imposition of the Default Rate), and interest at the Default Rate from September 25, 2007 to September 11, 2008 (the date of the hearing on the Objection). Interest under the contract is determined by application of the Index Rate, a variable rate which the parties are urged to determine by discovery of publicly available sources. Foster's claim for Late Charges is denied. The attorneys' fees as of September 4, 2008 are $8,265.50, consisting of Clever ($ 4,340), Kranson ($2,425.50) and Kaliner ($1500).

---

[13] The evidence that I have reviewed and discussed includes the additional months of legal fees. The problem with the Foster Claim is that it is a moving target. While interest is no longer accruing, Foster will be entitled to some additional legal fees for his bankruptcy counsel. With the retention of Kaliner, Clever's involvement will not be necessary nor reasonable.

An Order consistent with this Memorandum Opinion shall be entered.


_____
DIANE WEISS SIGMUND
United States Bankruptcy Judge

Dated:   December 23, 2008